E. A. SMITH et al., Appellants, v. IOWA STATE LIVE STOCK INSURANCE COMPANY et al., Appellees.

**INSURANCE:** Fraud and Misrepresentation—False Values. A willfully
1    false representation as to the value of stock and as to the amount paid therefor invalidates a policy issued by reason of such representation.

**EVIDENCE:** Opinion Evidence—Competency of Expert. So-called

2   expert testimony may very properly be stricken from the record when
the cross-examination demonstrates *per se* that the witnesses are not,
in fact, experts.

**INSURANCE:   Estoppel or Waiver—Knowledge of Dishonest Agent.**
3   The knowledge of an agent of an insurance company of material,
false representations on the part of an applicant for insurance, rela-
tive to the subject-matter of the insurance, may not be imputed to
the company when the agent is manifestly in league with the appli-
cant and bent on defrauding the company.

*Appeal from Keokuk District Court.*—H. F. WAGNER, Judge.

FEBRUARY 13, 1923.

THIS is an action upon a policy of insurance. The defense
was a general denial, and the further affirmative defense that
the policy of insurance was obtained by fraud and misrepresen-
tation, and that the conditions of the policy were violated after
the issuance thereof. At the close of plaintiff's evidence, the
trial court directed a verdict for the defendants, and the plain-
tiffs appeal.—*Affirmed.*

*J. H. Wyllie, F. M. Beatty,* and *Roberts, Webber & Lambert,*
for appellants.

*Tesdell & Mackaman, Stipp, Perry, Bannister & Starzinger,*
and *Stockman & Baker,* for appellees.

EVANS, J.—I. The policy in suit was issued by the defend-
ant Iowa State Live Stock Insurance Company. This company
having gone into liquidation, the defendant Farmers Live Stock
Insurance Company assumed its policies. The last named de-
fendant concedes its liability to the same extent as the former
company would have been liable. We shall not differentiate be-
tween the two defendant companies in the discussion, but shall
refer to them as one entity, and as the insurance company. The
policy in suit purported to be issued to E. A. Smith, one of the
plaintiffs herein. It was also made payable to the plaintiffs
Simonton and Wyckoff, as their interests may appear. These
last named plaintiffs joined with Smith in the action, and

claimed to be entitled to the full amount of the recovery. There is no dispute between them and Smith in that regard, but the nature and extent of their interest constitute, nevertheless, one of the important questions in the case. The policy insured against death "by sickness or accident" for the period of one year Spotted Queen and Goldie C Second, two sows of royal blood. The first of these was insured for $5,200, and the second for $2,400. On July 21, 1920, Smith purported to buy these sows at a public sale held by his coplaintiffs, and purported to bid the same off at $6,500 and $3,000 respectively. The good faith of these sales is challenged. Smith gave notes secured by a chattel mortgage on the sows for the full purchase price thereof. These papers were all legal on their face. The testimony of the plaintiffs, however, disclosed that there was a collateral agreement between the parties with reference thereto, and that this was partly in writing and partly oral. Under this agreement, Smith was to obtain insurance on these sows from the defendant company for the maximum allowable, of 80 per cent of the actual purchase price; the full premium therefor, amounting to more than $1,300, was to be paid by his coplaintiffs; and in the event of the death of the hogs, the proceeds of the insurance were to be paid to his coplaintiffs, and such payment was to satisfy the full liability of Smith for the purchase price. In obtaining the insurance, Smith represented to the insurance company that the sums herein named were the actual purchase price of these sows, and that he had paid the cash therefor. On November 30, 1920, these sows were kept in a pen 50 feet square, and housed in a little A-shaped hog house, 8 feet square, the slope of the roof extending from the ground to the comb. During that night, this hog house and its contents were consumed by fire. This fire resulted from a lantern which had been left in the hog house the night before by the young son of plaintiff Smith, the doors having been fastened so that escape for the sows was impossible. The insurance policy, as related to this claim, did not provide for *fire* insurance, but for *accident* insurance. One of the questions in the case is whether the sows died from accident. One of the restrictions of the policy was that it did not insure against death by the negligence of the owner. The application for the policy also contained a promis-

sory warranty that the animals would be "well cared for, and not neglected or abandoned or exposed to danger." The application also contained a representation that the actual cost of the sows to Smith was $6,500 and $3,000 respectively, and that he had paid cash therefor. At the close of plaintiffs' evidence, the defendants moved for a directed verdict, upon the following principal grounds:

(1) "Because the undisputed evidence in this case shows that the death of the sows described in the policy of insurance herein under the pleadings, that they did not meet death by accident.

(2) "That the undisputed evidence shows that said sows met their death by and through the negligence of E. A. Smith, one of the plaintiffs herein.

(3) "That the undisputed evidence shows that there was a breach of warranty contained in the application, which is a part of the policy as to the conditions and warranty as to the care of the animals, and that they would not be exposed to danger.

(4) "That the undisputed evidence shows that the plaintiff E. A. Smith was not the sole and unconditional owner of the subject of insurance."

(5) Because the evidence was without dispute that Smith obtained the insurance by false and fraudulent representations as to the cost of the animals and as to his actual payment of cash therefor.

The trial court sustained the motion generally, without specifying particular grounds. If any one of the grounds specified was tenable, the motion was properly sustained. We are disposed, therefore, to look first into the larger merits of the case. Was there a fraudulent representation as to the actual cost of these sows to Smith and as to his payment therefor? These sows belonged to the Spotted Poland China breed. Spotted Queen had been purchased at a public sale by the plaintiffs Simonton and Wyckoff, a few months previous to July 21st, for $370. Goldie C was raised by the same plaintiffs. She was about eight months old at the time of the sale. Spotted Queen was nearly two years old. Goldie C had not been bred at the time of the sale to

1. INSURANCE: fraud and misrepresentation: false values.

Smith, nor had she been successfully bred up to November 30th. The implications of the evidence, perhaps, are that Spotted Queen was a producer, though there is no direct evidence to that effect.

The plaintiff called three witnesses to prove the value. Each testified as a purported expert to the values claimed by the plaintiff, viz., $6,500 and $3,000 respectively. The cross-examination of these three witnesses resulted in significant disclosures. Messersmith testified on cross-examination as follows:

2. EVIDENCE: opinion evidence: competency of expert.

"Goldie C Second never had a litter of pigs. She was born November 6, 1919. Sows of this kind are generally bred at six to eight months. It would make a difference in the value whether she was a breeder or nonbreeder, and Goldie C Second was worth about $45 to $50, if she was not a breeder. I have bought hogs from Simonton and Wyckoff, and they have bought of me, and I have helped auctioneer sales for them, and I was a ring man at this sale. As a rule, ring men generally do considerable boosting. At this sale, there were about four ring men, all breeders of this particular kind of hogs. At these fine stock sales, these ring men usually do a lot of blowing and puffing. Just by reading it and hearing it, I know there is a great deal of exchanging among them. One man will attend another fellow's sale and bid away up on the stuff, and he in turn will bid on the other's stuff, when he has a sale. I know Baker & Stockman [attorneys for defendants]. I remember a particular conversation we had over in their office Monday morning. I told them I believed Goldie C Second was worth from $150 to $200, if I wanted to buy her. I think I actually made a mistake when I told them that. I should have said, worth about $2,000. I remember we were talking about these fancy prices, and I told them there that Goldie C Second was worth about $150 to $200, if I would want to buy her, and that Spotted Queen Second was worth about $250 to $300, if I wanted to buy her. That was my judgment."

The witness Gilmore, who was a breeder from Illinois, and had assisted at the Simonton and Wyckoff sale of July 21, 1920, admitted on cross-examination that he knew nothing about the breeding of these two sows. He did not know sire or dam or

grandsire or granddam. He had been one of the bidders at the sale, and had bid $6,250 for Spotted Queen. He had made no investigation of her history, nor was he able to supply any reason or data upon which he predicated the alleged value. He purported to base his judgment for value upon his observations of the animal. The witness Taylor was an auctioneer, who was present at the sale of July 21, 1920, and had also been associated with the sale wherein Spotted Queen was purchased by Simonton and Wyckoff for $370. He was unable to give any reason why so large a value should be placed upon either of these animals. He predicated his judgment solely upon the fact that it was his judgment. When it is considered that Spotted Queen had so recently sold at public sale for $370, an expert witness, if he was truly such, ought to be able to give some plausible reason for the large and sudden appreciation of value appearing herein. In view of the fact that these witnesses were present at the sale, whether as ''ringers'' or otherwise, and were actually making large bids thereon, it is quite inexplicable that they had no data either of history or breeding that induced them to make such bids. If there was any scheme on the part of the plaintiffs to give publicity to exaggerated sale prices, these witnesses were present, aiding in that scheme. The record furnishes no other explanation of their presence there, nor of their expert opinion upon the trial. We are of the opinion that, under the concessions of the cross-examination, the purported expert opinions of these witnesses were not expert opinions at all, and that the trial court could properly have struck out their testimony, on the ground that their qualification had failed. There was no attempt made to sustain these values, except by the witnesses named. It follows that the representation of Smith that the actual selling value and the cost to him of these animals was the sum stated, and that he had paid cash therefor, was false and misleading and necessarily fraudulent.

Whether Smith was a ''ringer'' or a mere dupe at the Simonton and Wyckoff sale, we shall treat as an open question, upon this record. On the one hand, he appears to have given his note for the purchase price at 8 per cent interest, and secured the same by mortgage. On the other hand, he appears to have been well protected by the collateral agreement, which

not only provided for a cancellation of the debt in the event of recovery upon the insurance policy, but provided also that the due date of the notes should be extended from time to time indefinitely, until Smith should be able to pay the purchase price out of the proceeds or product of the sows themselves. This bold draft upon eternity itself suggests a double conundrum:

(1)  How long would it take Smith to pay this purchase price, with 8 per cent interest, out of the product of the sows?

(2)  How long could Simonton and Wyckoff afford to pay an annual insurance premium of $1,350, while waiting for Smith to realize the principal and interest out of such product?

Smith's successful bids at the sale were in round numbers, and one of them, at least, was somewhat spectacular. The bid of $3,000 made for Goldie C was made, not by Smith, but by his son, a little lad nine years of age, who was proclaimed by Smith to the attendant crowd as a member of the firm of Smith & Son, and as part owner of the purchased animal. These are but side lights, and tend to cast doubt upon the sober sincerity of the big undertaking which Smith so cheerfully assumed. But the outstanding and material fact in the case is that, though Smith was the insured, as the purported owner, and procured the insurance and made the false representations, there never was a moment when he had a dollar of direct interest in the insurance or in the premium which paid for it. Such interest as he had was indirect, and was hostile to the survival of the sows. Nor was the interest of Simonton and Wyckoff any less hostile. The scheme thus conceived and put into effect was calculated to create a moral hazard in the highest degree. It clearly indicated a willingness on the part of Simonton and Wyckoff to sell the sows to the insurance company for 80 per cent of a purported price sufficiently inflated to stand the discount. It was well calculated to advance the possibilities of accident to a high degree of probability that the sows could not survive the insurance term. The accidental death which resulted on November 30th was the simplest solution of the double conundrum, and operated to the affirmative pecuniary advantage of Simonton and Wyckoff, and to the discharge of Smith

from an obligation which might otherwise have abided with him forever.

This brings us back to the basic proposition that Smith's representation of value and of purchase price was thoroughly false, both in letter and in spirit.

II.   The plaintiffs pleaded in reply that whatever mistake or misrepresentation was made by the plaintiff Smith was waived by the fact that its falsity was known to the company's agent who took the application. This is the real crux

3. INSURANCE:
   estoppel or
   waiver: knowl-
   edge of dis-
   honest agent.

of the case. Boyden, the purported agent, knew all about the arrangement between these plaintiffs, and the real question is whether, under the facts appearing in the record, the insurance company was charged with his knowledge. He was not only the agent of the insurance company; he was the agent of the plaintiffs. He was their banker. He handled their paper. The record implies that he was also their creditor. He was the clerk of the sale on July 21st, and made the settlement, acting as agent for Simonton and Wyckoff. He knew all about the arrangement with Smith. Smith's notes were transferred to him. He was interested in realizing upon them. To all intents and purposes, he was at all times either an agent for the beneficiaries or became himself a beneficiary by purchase of the paper. He knew that a disclosure of the real facts would defeat the application for insurance. He made no disclosures whatever to the insurance company. If fraud was perpetrated, he participated in it. Was the insurance company legally chargeable, under such circumstances, with the knowledge acquired by their agent? The law is well settled to the contrary effect. The rule which charges a principal with the knowledge of his agent is intended for the protection of those who deal with the agent in good faith. If a third person acts in bad faith, in order to defraud the principal, and the agent, knowing his acts of bad faith, co-operates with him, to the detriment of the principal, such conduct on the part of the agent amounts to mere collusion with the wrongdoer, and the principal is not chargeable with the knowledge obtained by the agent, so as to defeat his right of redress as against the wrongdoer. In *Hummell v. Bank of Monroe,* 75 Iowa 689, we said on this subject:

"The general rule is that the principal is bound by the knowledge of his agent, and that rule is based on the duty of the agent to communicate to the principal his knowledge with reference to the subject of the negotiation, and the presumption that he has performed that duty. *Distilled Spirits*, 11 Wall. 356. There are exceptions, however, to the rule. * * * The notice to the principal of such facts as were known to the agent, and were present in his mind at the time of the transaction, but the knowledge of which was not acquired in the business of the agency, is constructive. Ordinarily, the circumstances are such as to beget a presumption that the communication was in fact made. But when they are of such character that, according to all human experience and observation, the probability is just the reverse, it would be absurd to indulge that presumption. See *Kennedy v. Green*, 3 Mylne & K. 699. In the present case, if defendant had had actual notice when it took the draft of the facts known to Anderson, it would have been chargeable. But there is no probability that it would, with that knowledge, have taken it, and thereby incurred the liability. If he had communicated to it the facts within his knowledge before receiving the benefits which accrued to him under the transaction, all the objects he had in view would have been defeated. His connection with the transaction with plaintiff, and his object in disposing of the draft, were such that it is extremely improbable that he ever made the communication to it, and we think it cannot be charged with constructive notice of the facts."

See, also, 2 Corpus Juris 868 to 871; *Innerarity v. Merchants' Nat. Bank*, 139 Mass. 332 (1 N. E. 282).

We find no merit in the pleaded waiver. We are of the opinion that the trial court properly directed a verdict for the defendant. Its judgment is, accordingly,—*Affirmed*.

PRESTON, C. J., ARTHUR and FAVILLE, JJ., concur.